Andrew Roman Perrong, OSB No. 243320
a@perronglaw.com
Perrong Law LLC
2657 Mount Carmel Avenue
Glenside, PA 19038
215-225-5529
Attorney for Plaintiff and the Proposed Class

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## PORTLAND DIVISION

|  |  |
|---|---|
| LEON WEINGRAD, individually and on behalf of a class of all persons and entities similarly situated, | |
| Plaintiff | Case No. 3:26-cv-1 |
| vs. | |
| FEEL THE WORLD, INC D/B/A XERO SHOES, | OPPOSITION TO MOTION TO DISMISS/STRIKE TCPA (47 U.S.C. § 227) DEMAND FOR JURY TRIAL |
| Defendant | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS AND/OR STRIKE CLASS ALLEGATIONS**

## CONTENTS

Introduction ........................................................................................................................ 1

Factual Background ........................................................................................................... 2

Legal Standard .................................................................................................................. 3

Argument ........................................................................................................................... 4

    I. Plaintiff Did Not Provide "Express" Consent to Receive a Years-Long Marketing Campaign by Sending Replies. ........................................................................................ 4

    II. Plaintiff Effectively Revoked Any Putative Consent Multiple Times Over. ....................... 12

    III. Plaintiff States a Claim Under 47 C.F.R. § 64.1601(e). ...................................................... 16

    IV. This Court Has Already Rejected the Theory the Do Not Call Registry Requires Personal Registration. ................................................................................................................. 23

    V. The Motion to Strike Class Allegations Must Be Denied. ...................................................... 24

        A. This Court Already Denied an Essentially Identical Motion in DaBella; the Same Analysis Applies Here. ................................................................................................... 24

        B. The National DNC Class Should Not Be Struck. ............................................................. 25

        C. The Caller ID Class Should Not Be Struck. ..................................................................... 29

        D. The Internal Do Not Call Class Should Not Be Struck. .................................................... 32

        E. In Any Event, the Remedy Is Amendment, Not Striking. .................................................. 34

Conclusion ........................................................................................................................ 35

## TABLE OF AUTHORITIES

**Cases**

*ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687, 705 (D.C. Cir. 2018) ................................. 5

*Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 600 (9th Cir. 2014) ........................................................................................................................ 22

*Aley v. Lightfire Partners, LLC*, No. 5:22-CV-00330 (AMN/TWD), 2024 WL 4007345 (N.D.N.Y. Aug. 30, 2024) .................................................................................................. 26

*Allison v. Dolich*, No. 3:14-CV-01005-AC, 2019 WL 921436 (D. Or. Feb. 25, 2019), aff'd, 815 F. App'x 135 (9th Cir. 2020) ............................................................................................. 30

*Anthony v. Fed. Sav. Bank*, No. 21 C 2509, 2025 WL 3101827 (N.D. Ill. Nov. 6, 2025) ............. 27

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................................ 3

*Barnes v. AT&T Pension Ben. Plan-Nonbargained Program*, 718 F. Supp. 2d 1167 (N.D. Cal. 2010) ........................................................................................................................ 4

*Barton v. LeadPoint, Inc.*, No. C21-5372 BHS, 2022 WL 123352 (W.D. Wash. Jan. 13, 2022), aff'd, No. 22-35130, 2023 WL 4646103 (9th Cir. July 20, 2023) ............................. 10, 11

*Bates v. Bankers Life & Cas. Co.*, 993 F. Supp. 2d 1318 (D. Or. 2014) ......................................24

*Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644 (2020)..........................................................6, 21

*Bridging Communities Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119 (6th Cir. 2016).......................27

*Charvat v. Southard Corp.*, No. 2:18-CV-190, 2019 WL 13128407 (S.D. Ohio Sept. 30, 2019) ..8

*Dobronski v. SelectQuote Ins. Servs.*, 773 F. Supp. 3d 373 (E.D. Mich. 2025) ............................16

*Eldridge v. Cabela's Inc.*, No. 3:16-CV-536-DJH, 2017 WL 4364205 (W.D. Ky. Sept. 29, 2017) ......................................................................................................................................................34

*Epps v. Earth Fare, Inc.*, 740 F. App'x 627 (9th Cir. 2018) ...................................................13, 14

*Franklin v. Depaul Univ.*, No. 16 C 8612, 2017 WL 3219253 (N.D. Ill. July 28, 2017)................6

*Gen. Tel. Co. of SW. v. Falcon*, 457 U.S. 147 (1982).....................................................................25

*Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246 (9th Cir. 1997) ...........................................................4

*Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983 (9th Cir. 2023) ..........................................................32

*Hamilton v. Spurling*, No. 3:11-cv-102, 2013 WL 1164336 (S.D. Ohio Mar. 20, 2013)................9

*Harris v. Palm Springs Alpine Ests., Inc.*, 329 F.2d 909 (9th Cir. 1964) .....................................34

*Hinman v. M & M Rental Ctr., Inc.*, 545 F. Supp. 2d 802 (N.D. Ill. 2008)...................................27

*Hunter v. Legacy Health*, No. 3:18-CV-02219-AR, 2024 WL 1155382 (D. Or. Mar. 18, 2024) .34

*Jimenez v. Menzies Aviation Inc*, No. 15–CV–02392–WHO, 2015 WL 4914727 (N.D. Cal. Aug. 17, 2015) ................................................................................................................................34

*Katz v. CHW Grp., Inc.*, No. 5:22-CV-5198, 2023 WL 6445798 (W.D. Ark. Sept. 29, 2023)....25, 26, 34

*Kavu, Inc., v. Omnipak Corp.*, 246 F.R.D. 642 (W.D. Wash. 2007) .............................................27

*Kolinek v. Walgreen Co.*, No. 13 C 4806, 2014 WL 3056813 (N.D. Ill. July 7, 2014)...................6

*Landsman & Funk PC v. Skinder-Strauss Assocs.*, 640 F.3d 72 (3d Cir. 2011) ...........................27

*Leon v. Loandepot.com, LLC*...........................................................................................................26

*Mantha v. QuoteWizard.com, LLC*, 347 F.R.D. 376 (D. Mass. 2024) ...................................13, 26

*Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025 (9th Cir. 2008)...............................3

*Massarello v. Power Home Remodeling Grp., LLC*, 2025 WL 2463153 (E.D. Mich. Aug. 27, 2025) ...........................................................................................................................................5

*Mattson v. New Penn Fin., LLC*, 2018 WL 6735088 (D. Or. Nov. 6, 2018)..................................24

*McMillion v. Rash Curtis & Assocs.*, No. 16-CV-03396-YGR, 2018 WL 692105 (N.D. Cal. Feb. 2, 2018) ....................................................................................................................................13

*Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036 (9th Cir. 2012) ....................................6

*Morris v. Copart*, No. 4:15-CV-724, 2016 WL 6608874 (E.D. Tex. Nov. 9, 2016).......................9

*Murch v. GPS Capital Markets, LLC*, No. 3:24-cv-01854-SB, 2025 WL 2466576 (D. Or. June 6, 2025) ................................................................................7, 10, 23, 28, 29

*N.L. by Lemos v. Credit One Bank, N.A.*, 960 F.3d 1164 (9th Cir. 2020) ...............................10, 11

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917 (9th Cir. 2008) ....................22

*Newell v. JR Capital, LLC*, 791 F. Supp. 3d 571 (E.D. Pa. 2025)...........................................22, 23

*Novia v. Mobiz, Inc.*, No. 25-CV-11036-AK, 2026 WL 752181 (D. Mass. Mar. 17, 2026) ...23, 31

*Ott v. Mortg. Invs. Corp. of Ohio, Inc.*, 65 F. Supp. 3d 1046 (D. Or. 2014) .................................24

*Sauter v. CVS Pharmacy, Inc.*, No. 2:13-CV-846, 2014 WL 1814076 (S.D. Ohio May 7, 2014) 25

*Smith v. Marsh*, 194 F.3d 1045 (9th Cir. 1999) ...........................................................................20

*Thrower v. Citizens Disability, LLC*, No. CV 20-10285-GAO, 2022 WL 3754737 (D. Mass. Aug. 30, 2022) .................................................................................................................................27

*Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037 (9th Cir. 2017)........................12, 27, 32

*Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954 (9th Cir. 2010)................5

*Wakefield v. ViSalus, Inc.*, 51 F.4th 1109 (9th Cir. 2022) .............................................................20

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ..................................................................28

*Weingrad v. DaBella Exteriors, LLC*, No. 3:25-CV-396-SI, 2026 WL 496609 (D. Or. Feb. 23, 2026) ....................................................................................................................13, 16, 24

*Whittlestone, Inc. v. Handi–Craft Co.*, 618 F.3d 970 (9th Cir. 2010) ..............................................4

*Williams v. PillPack LLC*, 343 F.R.D. 201 (W.D. Wash. 2022) ...................................................26

*Wilson v. Safeway, Inc.*, 2025 WL 2496010 (D. Or. Aug. 29, 2025) ...........................................24

*Wilson v. TPH Paralegal Pro. Corp.*, No. 6:25-CV-01703-MTK, 2026 WL 899930 (D. Or. Apr. 1, 2026) ...................................................................................................................................25

*Zemel v. CSC Holdings, LLC*, No. 2:18-cv-00859, 2018 WL 6242484 (D.N.J. Nov. 29, 2018) ....9

**Statutes**

47 U.S.C. § 227(b) ......................................................................................................................9, 34

47 U.S.C. § 227(c) .............................................................................................................................9

47 U.S.C. § 227(c)(5)..................................................................................................................16, 34

**Regulations**

47 C.F.R. § 64.1200(c)....................................................................................................................15

47 C.F.R. § 64.1200(c)(2)(ii)...........................................................................................4, 8, 9, 11, 27

47 C.F.R. § 64.1200(d) .......................................................................................................15, 16, 34

47 C.F.R. § 64.1200(f)(5) .................................................................................................................7

47 C.F.R. § 64.1600(b) .................................................................................................1, 17

47 C.F.R. § 64.1600(e)..................................................................................................1, 16

47 C.F.R. § 64.1601 ..........................................................................................................17

47 C.F.R. § 64.1601(e)...............................................................16, 19, 20, 21, 22, 23, 30, 32

47 C.F.R. § 64.1601(e)(1)..................................................................................................23

## Rules

Fed. R. Civ. P. 8(a) .............................................................................................................3

Fed. R. Civ. P. 12(b)(6)..........................................................................................3, 5, 6, 23

Fed. R. Civ. P. 12(f) ...........................................................................................1, 4, 25, 28

Fed. R. Civ. P. 23.............................................................................................................25

Fed. R. Civ. P. 23(b)(3)....................................................................................................27

Fed. R. Civ. P. 23(c)(1)(C) ..........................................................................................33, 34

## Administrative Materials

In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991, 7 F.C.C.
        Rcd. 8752 (1992) ...............................................................................................11

In Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Rcd. 14014
        (2003)...............................................................................................................19

In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991, 20 F.C.C.
        Rcd. 3788 (2005) ...............................................................................................19

In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991, 30 F.C.C.
        Rcd. 7961 (2015) ...........................................................................................14, 15

## Other Authorities

ATIS-0300106, Chapter 8, Clause 2.1, Phantom Traffic ...............................................................17

ATIS-1000113.2015-Chapter 2, Clause 2.16, Calling Party Number .........................................17

ATIS-1000113.2015-Chapter 3, Clause 3.7, Calling Party Number .............................................17

Do Not Call Implementation Act of 2007.................................................................................24

Travis Russell, Signaling System #7 (3rd ed. 2002)...........................................................17, 18, 23

**Introduction**

Xero Shoes' motion stakes everything on a single move: rebranding a handful of messages as binding "express consent" to a years-long unsolicited marketing campaign. Stripped of its rhetoric, the motion asks this Court to hold that less than ten syllables uttered over six calls sent by Plaintiff over four months in 2024 ("Ok," "I am," "Nice!," "Hello," "Thanks," "You two") silently authorized two dozen telemarketing calls about shoes and seasonal sales sent up to a year later, addressed to a man named "Joseph" whom Plaintiff has never met. The TCPA does not work that way. The motion fundamentally misapprehends the law of consent under the TCPA, misreads the TCPA's revocation regime, fails to grapple with the technical nature of the TCPA's caller ID regulations, and misreads what is permissible to decide on a Rule 12 motion.

Four points dispatch Defendant's motion entirely. First, responding with short replies to a series of unconsensual, unsolicited messages, is not *express* consent under the TCPA. If anything, it is a business inquiry, which has long since flamed out. Second, Plaintiff revoked any putative consent multiple times over by telling Defendant it was contacting the wrong number in November of 2025, filing this lawsuit, and still getting called. Defendant's response is that the Court should ignore those messages because Plaintiff failed to use the magic word "STOP," a proposition which the FCC has explicitly rejected. Third, the caller ID claim turns on a precise technical fact. The 5-digit short code 65099 is not a CPN or ANI as those terms are defined in 47 C.F.R. § 64.1600(b) and (e), because those definitions are anchored to the Signaling System 7 public switched telephone network, and because the short code is not routable using SS7. Fourth, the motion to strike is premature on its face. This Court has already addressed the same plaintiff's class allegations on a Rule 12(f) motion in *Weingrad v. DaBella Exteriors, LLC*, and denied it. Defendant cannot show that any of Plaintiff's three classes is facially uncertifiable. Its

arguments are pre-discovery merits arguments dressed up as Rule 23 objections. They belong at certification on a developed record, or, frankly, not at all.

Defendant's motion should be denied in its entirety.

### Factual Background

Plaintiff Leon Weingrad has a 503- area code cellular telephone number he uses for personal, residential, and household purposes only. First Amended Complaint ("FAC") ¶ 4, 18-20. He has never been a customer of Xero Shoes, has never knowingly given Xero Shoes his telephone number, and has never consented to receive Xero Shoes marketing messages. *Id.* ¶ 21, 31. But, beginning at least as early as August 2024, Xero Shoes began sending unsolicited promotional text message calls to Plaintiff's number, addressing them to a man named "Joseph" and transmitting them from the 5-digit short code 65099. *See* FAC, Ex. A. Plaintiff is not Joseph; Plaintiff does not know who Joseph is. FAC ¶ 22.

Plaintiff acknowledges that on a few occasions between August and December 2024, he sent stray short replies to Defendant's unsolicited messages, words like "Ok," "I am," "Nice!," "Hello," "Thanks," and "You two," at least some of which were sent through his phone's "quick response" feature. *Id.* ¶ 24. None of those replies asked any questions about Xero Shoes' products, requested any services from Xero, indicated a desire to purchase any products, scheduled any appointment, or provided Defendant with any specific product inquiry or contact information. None of them was preceded by Plaintiff visiting a website, filling out a form, or submitting his telephone number to anyone. *Id.* ¶ 24-26, 31, Ex. A.

After taking a brief hiatus and after having apparently stopped calling the Plaintiff, Defendant did not call Plaintiff again until September 27, 2025, more than nine months after Plaintiff last sent such a message in December 2024. FAC ¶ 25. Plaintiff sues only for messages Defendant sent on or after that date. *Id.* ¶ 27. Between September 27, 2025 and January 2026,

Defendant sent at least 24 promotional text messages, all from the same 65099 short code, advertising sitewide sales, holiday discounts, and other promotions. *Id.* ¶ 32, 41–47.

On November 6, 2025, Plaintiff sent Defendant the message "Wrong number." FAC ¶ 28; Ex. A. Defendant received that message and responded twice, first with form opt-out language and second with a personalized message offering to assist Plaintiff with an "account change," referencing him as "Joseph." *Id.* Plaintiff has no Xero Shoes account to change. *Id.* ¶ 31. Defendant nevertheless continued sending Plaintiff promotional text message calls for the next two months. Plaintiff filed this action on January 1, 2026, being assigned Case Number 1. Defendant was served on January 9, 2026. On January 9 and again on January 13, after service, Defendant sent Plaintiff at least two additional promotional text message calls. FAC ¶ 28, 42. On January 30, 2026, after still further unsolicited messages and after Xero had been served, Plaintiff sent Defendant another message reading, in full: "Please halt these texts please. They are disturbing my life." FAC, Ex. A. Defendant has now moved to dismiss the First Amended Complaint or to strike the class allegations. This response follows.

**Legal Standard**

To survive a motion to dismiss under Rule 12(b)(6), a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). The Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). "The Rule 8 standard contains a powerful presumption

against rejecting pleadings for failure to state a claim." *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997) (cleaned up).

Federal Rule of Civil Procedure 12(f) permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). The function of a motion made under this rule is "to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Whittlestone, Inc. v. Handi–Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010). "While a Rule 12(f) motion provides the means to excise improper materials from pleadings, such motions are generally disfavored because the motions may be used as delaying tactics and because of the strong policy favoring resolution on the merits." *Barnes v. AT&T Pension Ben. Plan-Nonbargained Program*, 718 F. Supp. 2d 1167, 1170 (N.D. Cal. 2010). With a motion to strike, just as with a motion to dismiss, the court should view the pleading in the light most favorable to the nonmoving party and deny the motion if there are any doubts. *Id.*

### Argument
### I. Plaintiff Did Not Provide "Express" Consent to Receive a Years-Long Marketing Campaign by Sending Replies.

As an initial matter, Defendant reads the word "express" out of the standard it cites. Defendant invokes the TCPA's consent regime, which itself is an *affirmative defense* inapplicable for adjudication under Rule 12(b)(6), but never confronts what the *regulation* actually requires for TCPA consent to a number on the Do Not Call Registry, "a *signed*, *written* agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller *and includes the telephone number to which the calls may be placed*." 47 C.F.R. § 64.1200(c)(2)(ii). Defendant identifies no writing, let alone a signed one, and no express agreement, let alone one listing the Plaintiff's telephone number. It instead asks the

Court to treat short replies as a functional substitute for prior *express* written consent. The regulation does not permit substitutes.

What's more, when a number is reassigned to a different subscriber, any prior consent to contact that number is extinguished. *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687, 705 (D.C. Cir. 2018). As a result, Xero called Mr. Weingrad's number without his consent. And as the Eastern District of Michigan recently held, "Congress intended, as consistent with the statute's text and purpose, to impose strict liability for nonconsented-to robocalls, even when innocently made to a wrong or reassigned number." *Massarello v. Power Home Remodeling Grp., LLC*, 2025 WL 2463153, at *3 (E.D. Mich. Aug. 27, 2025). Xero's purported consent from earlier cannot bind Mr. Weingrad, who acquired the number later and never provided consent.

But an even more fundamental threshold problem dooms Defendant's entire consent argument from the outset. Consent is an *affirmative defense*, for which the *Defendant bears the burden of proof*, not a pleading element. Plaintiff is not required to plead the absence of consent, much less plead around it, and Defendant cannot manufacture a 12(b)(6) dismissal by asserting consent as a factual matter and asking the Court to credit its version of events. And the Ninth Circuit has held, categorically, that a defendant cannot raise an affirmative defense using a Rule 12(b)(6) motion unless the defense is evident from the face of the complaint. *See Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010). Nothing about consent is apparent on the face of this Complaint. To the contrary, Plaintiff expressly alleges he never consented to receive telemarketing text message calls, that he never did business with Defendant, and never knowingly provided Defendant with his telephone number. Moreover, he denies that the aforementioned communications constituted valid or sufficient TCPA consent as a matter of law.

Oppn. MTD                                          5

Defendant's contrary position depends entirely on its characterization of six calls Plaintiff sent in 2024, viewed through Defendant's preferred legal lens, and whether they create an affirmative defense. But consent is a factual and legal dispute that must be resolved on a developed record, not at the pleadings stage. *See Kolinek v. Walgreen Co.*, No. 13 C 4806, 2014 WL 3056813, at *4 (N.D. Ill. July 7, 2014) (rejecting prior express consent defense at the MTD stage because court was required to take plaintiff's allegation he did not consent as true); *Franklin v. Depaul Univ.*, No. 16 C 8612, 2017 WL 3219253, at *4 (N.D. Ill. July 28, 2017) (same). The Court need not, and should not, go any further. But because Defendant's consent theory also fails on its own merits, Plaintiff addresses it in full below.

As an initial matter, Defendant cites *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1042 (9th Cir. 2012), for general TCPA consent principles, but skips past the requirement that the consent be express. Every word in the statute has meaning, and the word "express" is a meaningful requirement. It explicitly forecloses the argument that *implied* consent under the TCPA is consent at all. Sending a short call in response to an unsolicited promotional marketing call is not an "express" anything. It is, at most, an acknowledgement of receipt. When interpreting a statute, "[o]nly the written word is the law, and all persons are entitled to its benefit." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 653 (2020). The word Congress and the FCC chose was "express." Defendant's position reduces to the proposition that any reply at all is consent. That cannot be reconciled with the regulation's text.

As more fully addressed in Plaintiff's opposition to Defendant's Request for Judicial Notice, Defendant's serial plaintiff narrative is not a Rule 12 defense, and it is not even a colorable substantive defense. The TCPA is a private enforcement statute that Congress *deliberately* designed to be enforced by ordinary consumers willing to bring suit. This Court has

already rejected precisely the kind of narrative Defendant advances here. In *Murch v. GPS Capital Markets, LLC*, 2025 WL 2466576, at *2, *6-8 (D. Or. June 6, 2025), this Court rejected a similar argument that playing along with the calls and actually using a fake name there somehow deprived the plaintiff of standing. As the *Murch* Court appropriately recognized, the TCPA governs a caller's conduct, not the recipient's. If anything, Plaintiff did less than the plaintiff in *Murch.* He made a handful of erroneous reply calls, he did not pretend to be anyone, let alone "Joseph," did not solicit a callback, and did not offer to take a message for "Joseph." In fact, he expressly told Xero that it had the "Wrong number."

Defendant's narrative also fails on its own facts. A consumer does not "manufacture" a TCPA claim by failing to prevent a telemarketer from violating the statute. The relevant question is whether Defendant had legally sufficient consent as an initial matter, and the answer is a resounding "no." Defendant's own message log shows that it addressed its calls to a man named "Joseph," rendering the Plaintiff's "wrong number" reply an accurate state of affairs, received that response, and replied with a nonsensical offer to make an "account change" to an account Plaintiff does not have. It was then served with a federal lawsuit and kept calling anyway. Every link in that chain is Defendant's conduct, not Plaintiff's. The TCPA does not reward telemarketers who ignore such clear messages on the baseless theory that the recipient is too experienced with the statute to deserve its protection.

At most, Defendant argues an existing business relationship (EBR) "inquiry" theory, and that theory is self-defeating on the timeline at bar. In substance and form, Defendant relabels a potential EBR as express consent. And though the TCPA does recognize an "inquiry or application" EBR for telephone solicitations, it lasts only three months. 47 C.F.R. § 64.1200(f)(5). Defendant cannot have it both ways.

If the reply calls constitute "express consent," they must satisfy § 64.1200(c)(2)(ii)'s specific standards. On this point, Defendant's silence is telling. Despite citing the standard in passing, Defendant does not grapple with the signed writing requirement, to say nothing of the specific phone number requirement. Defendant cites no authority, because there is none, for the proposition that a telephone call back to an unsolicited call satisfies that regulation. But even assuming *arguendo*, that the Plaintiff made a handful of single word calls back sufficient to constitute an EBR "inquiry," then any EBR would have expired no later than March 2025, 90 days after Plaintiff's last 2024 reply on December 3, well before the September 27, 2025 messages on which Plaintiff sues. Either way, Defendant loses.

Defendant will likely retort that other courts have found that EBRs have formed when a call recipient plays along with a caller. Notwithstanding that such argument is time-barred after three months, a review of analogous cases illustrates why no EBR, to say nothing of express consent, would have formed on the basis of the Plaintiff's responses. *Charvat v. Southard Corp.*, No. 2:18-CV-190, 2019 WL 13128407 (S.D. Ohio Sept. 30, 2019), is the cleanest counterexample. The court there found *no EBR*, let alone consent, was created on calls in which the plaintiff merely asked questions about the company itself, such asking for the company's name, website, and phone number, which the FCC has said is "more akin to an inquiry about a business's hours or location, which the FCC has said is insufficient to create an EBR." *Id.* at *5. An EBR arose only on a later call when the plaintiff asked specifically "how long is the warranty on those [windows], in general?" *Id.* That was "unambiguously an inquiry about products or services." *Id.* Plaintiff's replies here were *thinner* than even what the *Charvat* court held was *insufficient* to create an EBR by asking general questions about the seller's business. The Plaintiff's responses were not questions at all, much less ones about a specific product.

Oppn. MTD                                              8

Two other cases further illustrate why the Plaintiff's responses did not constitute an EBR, let alone TCPA *consent*. For example, in *Hamilton v. Spurling*, No. 3:11-cv-102, 2013 WL 1164336 (S.D. Ohio Mar. 20, 2013), a consumer affirmatively scheduled a treatment appointment with a chiropractor. The Court found an EBR formed by the act of scheduling. *Id.* at *10. Plaintiff scheduled nothing here. He typed "Ok." And in *Morris v. Copart*, No. 4:15-CV-724, 2016 WL 6608874 (E.D. Tex. Nov. 9, 2016), a consumer falsely affirmed he had a vehicle to donate and supplied fake vehicle, address, and donation information. *Id.* at *9. Subsequent calls were all in furtherance of that purported donation, and the court observed that the calls ceased once plaintiff disclaimed he actually wanted to donate anything. Plaintiff here provided no vehicle, no address, no fake information, no scheduling. And, unlike in *Morris*, the Plaintiff received multiple calls *after* he disclaimed that he was the person Defendant was looking for.

Nor does *Zemel v. CSC Holdings, LLC*, No. 2:18-cv-00859, 2018 WL 6242484 (D.N.J. Nov. 29, 2018), the linchpin of Defendant's consent argument, help Defendant. That case cannot bear the weight Defendant assigns to it for at least three reasons. First, *Zemel* addresses the consent regime for prerecorded calls under Section 227(*b*) of the TCPA, not the consent regime for calls to a number on the Do Not Call Registry under Section 227(*c*) of the TCPA at issue here. Reading *Zemel* across that statutory line, as Defendant does, ignores the regulation, § 64.1200(c)(2)(ii), actually in play. Second, the *Zemel* discussion of "inviting a responsive text" was effectively *dicta* on a waived issue. The Court itself observed that "Zemel does not respond to this argument in its opposition brief." 2018 WL 6242484, at *4. That makes *Zemel* a rare TCPA consent ruling reached without adversarial briefing. Its persuasive value is correspondingly limited. Third, even on its own terms, *Zemel* involved a confirmatory exchange for the Plaintiff's addition of a telephone number to his Optimum ID account. *Id.* Plaintiff here

has no Xero Shoes account and never did any business with Xero. The calls here were unsolicited promotional marketing calls, not transactional confirmations.

Elsewhere in its brief, Xero leans heavily on *Murch v. GPS Capital Markets, LLC*, No. 3:24-cv-01854-SB, 2025 WL 2466576 (D. Or. June 6, 2025). But *Murch* is fatal to Defendant's broader proposition. There, the plaintiff actively engaged the caller, pretended to be "Kathy," and offered to take a message for the intended recipient. The Court held that this engagement did *not* deprive her of standing and did *not* constitute consent. *Id.* at *7-8 ("Here, however, it is undisputed that Murch did not consent to receive the calls at issue."). *Murch* adopted the Ninth Circuit's holding in *N.L. by Lemos*, rejected an "intended recipient" defense, and reaffirmed that the dispositive question is whether the called party *herself* consented, not whether surface-level interactions might subjectively look agreeable to a telemarketer. *Id.* Plaintiff alleges he never consented. Short responses to unsolicited messages cannot retroactively manufacture the express, signed, written, seller-specific and number-specific consent the regulation requires.

Defendant also aggressively cites *Barton v. LeadPoint, Inc.*, No. C21-5372 BHS, 2022 WL 123352, at *1 (W.D. Wash. Jan. 13, 2022), *aff'd*, No. 22-35130, 2023 WL 4646103 (9th Cir. July 20, 2023), but *Barton* is materially distinguishable. The *Barton* plaintiff received a misaddressed text to his number, clicked the embedded link, was taken to a website called "homeequityquiz.com." *Id.* at *2. But that's not all, and it's what Defendant leaves out that counts for the most. While on that website, the Plaintiff "answered questions," *and* "*submitted his cell phone number*." *Id.* That last step, the *affirmative submission of his number* into a marketing intake form, was what put the "express" into express consent. Barton therefore proves the opposite of Xero's rule. The conduct that mattered was the plaintiff's *affirmative submission of his number* on a website, not his mere interaction with a misaddressed message.

Oppn. MTD                                    10

Mr. Weingrad did nothing remotely comparable. He did not visit any website. He did not submit his number to anyone. He did not fill out any form. He did not request information specific to Xero Shoes' products. He made short reply calls, sometimes by accident, to an unsolicited marketing blast addressed to a man named "Joseph." And whether or not those replies were accidental or intentional is besides the point. They clearly were not signed, seller-specific, number-specific written permissions to send telemarketing messages to a number on the Do Not Call Registry. Defendant cannot equate a short reply call with the conduct that supplied the requisite express consent in *Barton*. Defendant cites no case in which mere reply calls to an unsolicited call were held to constitute § 64.1200(c)(2)(ii) consent.

In fact, that is not the law. The FCC has declared that a necessary element for a person to provide "consent" is that the person must *knowingly and voluntarily* provide the telephone number at which the person is authorizing telemarketing calls to be received. For example, capturing a caller's telephone number by a Caller ID or ANI device cannot be considered consent to receive telemarketing calls. *In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 7 F.C.C. Rcd. 8752, 8769 (1992). Here, as outlined above, nobody obtained any consent from Mr. Weingrad, and in fact acted contrary to his explicit stated instructions and protestations that Xero was evidently contacting a wrong number. *Barton* is also distinguishable on this point as well. The *Barton* plaintiff never told the caller it had reached the wrong number. Here, by contrast, Plaintiff explicitly told Defendant in November 2025 that it had a "Wrong number," and Defendant kept calling for months thereafter.

And finally, were there any doubt otherwise, it is equally as clear that consent provided by the prior owner of a telephone number is insufficient to constitute consent to contact the number's current owner. *N.L. by Lemos v. Credit One Bank, N.A.*, 960 F.3d 1164, 1167 (9th Cir.

2020) (rejecting the "intended recipient" defense and holding that "[the defendant]'s intent to call a customer who had consented to its calls does not exempt [it] from liability under the TCPA when it calls someone else who did not consent"). Independently of everything above, the only "consent" Defendant can plausibly point to ran to a person named "Joseph," not to Plaintiff. The motion itself *concedes* Defendant believed it was texting "Joseph." Whatever consent "Joseph" may once have given, it belongs to Joseph, whoever he is. It cannot ratify calls to Plaintiff. Plaintiff alleges the number is his and never gave consent to Xero Shoes. That is the end of the consent inquiry.

## II. Plaintiff Effectively Revoked Any Putative Consent Multiple Times Over.

As a threshold matter, Xero's revocation argument has a logical predicate that it has not satisfied, and that is valid consent. Without valid consent in the first place, there is no consent to revoke. If, as Plaintiff has shown above, Defendant never lawfully obtained Plaintiff's consent, the Court need not reach revocation. Plaintiff nonetheless addresses revocation because the FCC has spoken decisively on this issue, and Defendant's position cannot survive that authority.

Defendant's lead revocation argument is that Plaintiff used the word "halt," not "STOP." Notwithstanding the fact that this message was sent in January and during the pendency of this litigation, Defendant completely ignores Plaintiff's "Wrong number" call sent in November. This is the entire problem with Defendant's motion distilled to a single line. The TCPA does not require "STOP" as the only revocation incantation. As Defendant itself states, the Ninth Circuit's standard is whether revocation "clearly express[es a] desire not to receive further calls." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1048 (9th Cir. 2017). The message stating "Wrong number" and, later, "Please halt these texts please. They are disturbing my life" could not satisfy that standard more obviously. Defendant cannot seriously contend either message does not express a clear desire not to receive calls.

Were that not enough, the Plaintiff's filing suit is an independent revocation of consent. Plaintiff filed his Complaint on January 1, 2026, and Defendant was served on January 9, 2026. Defendant kept calling anyway. Courts uniformly hold that the filing or service of suit constitutes revocation of any putative consent. *McMillion v. Rash Curtis & Assocs.*, No. 16-CV-03396-YGR, 2018 WL 692105, at *6 (N.D. Cal. Feb. 2, 2018) ("the service of plaintiffs' complaint effectively revoked consent to be called"); *Mantha v. QuoteWizard.com, LLC*, 347 F.R.D. 376, 394 (D. Mass. 2024) ("Though his number was not in QuoteWizard's DNC files, that is because he expressed his desire for the texts to cease by suing, rather than texting back.").

This Court already credited that theory at the pleadings stage in another case involving Mr. Weingrad, in *Weingrad v. DaBella Exteriors, LLC*, No. 3:25-CV-396-SI, 2026 WL 496609, at *7 (D. Or. Feb. 23, 2026), where Judge Simon remarked that "DaBella makes no argument that Mr. Weingrad did not, in effect, communicate with the company that he wanted the communications to stop, or that DaBella was unaware of Mr. Weingrad's desires." The same is true here. Defendant cannot plausibly claim it failed to understand a filed federal lawsuit explicitly alleging it was sending unwanted texts to the wrong person, to say nothing about the "Wrong number" call the Plaintiff made in November.

Next, consider the importance of that very call. Before suit was filed, Plaintiff told Xero that it had a "Wrong number." Defendant's own response is dispositive. It replied with a *personalized message* offering to help with an "account change." FAC, Ex. A. That response confirms Defendant received, processed, and understood the message. This is not *Epps*; it is the opposite of *Epps*. In *Epps*, the defendant provided "notice to Epps that it did not understand her non-standard messages," and so the Ninth Circuit agreed "with the district court that Epps failed plausibly to allege that she reasonably revoked her consent." *Epps v. Earth Fare, Inc.*, 740 F.

App'x 627, 628 (9th Cir. 2018). Here, Defendant's own response shows it knew *exactly* what Plaintiff meant but instead offered to help update a non-existent account. The *Epps* plaintiff's verbose communications gave no indication the defendant actually understood that revocation was being attempted, and defendant sent messages disclaiming understanding. *Id.* Here, by contrast, Defendant's own response acknowledged Plaintiff's "wrong number" message and offered to update an account, demonstrating that Defendant in fact did understand Plaintiff's call.

The *Epps* rationale, as well as those of its progeny, including *Rando* and *Viggiano*, all turn on the absence of any defendant action acknowledging the revocation or expressly stating that it the defendant did not understand the call. That the plaintiffs there were unable to opt out where the defendant could not be expected to understand the call, has no application where, as here, Defendant's response confirms it understood the request. Plaintiff did the opposite of the verbose, nonsensical messages in *Epps* and its progeny. He plainly told Defendant it was contacting the wrong number. Defendant's response was a nonsensical "account change" offer for an account Plaintiff does not have. Defendant cannot have it both ways. Either Defendant understood Plaintiff was telling it to stop, in which case Defendant's continued texting violates the TCPA, or Defendant did not understand, in which case its offer to make an "account change" for an account Plaintiff does not have makes no sense. Both readings doom the motion.

What's more, Defendant's deepest legal error is the assumption that a telemarketer may dictate the words a consumer must use to revoke consent, such as requiring use of the word "STOP." That is categorically not the law. The FCC has expressly held that consumers may revoke consent through "any reasonable means" and that telemarketers may not unilaterally narrow the channels or methods available for revoking any purported consent (which, as explained, did not exist in the first instance). *In the Matter of Rules & Reguls. Implementing the*

*Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, 7965 (2015). A telemarketer's preferred opt out instructions, such as one stating that one reply "STOP," supplements, and does not supplant, a consumer's right to revoke through other reasonable means. Defendant's argument that the Court should disregard "wrong number" language and the filing of this lawsuit because none of them is the magic word "STOP" is *precisely* the regime the FCC has rejected.

And, after Plaintiff said "Wrong number," Defendant responded by offering to make an "account change" to an account that does not exist. This is textbook jumping through hoops, which the FCC has long rejected as a permissible revocation barrier and turns the standard relied on in the cases Defendant cites on its head. Defendant's position requires the Court to hold both that (i) Plaintiff failed to follow Defendant's preferred opt-out instructions, *and* (ii) Plaintiff should additionally have engaged with an "account change" protocol for an account he could not access, after he had already told Defendant in plain English that it was contacting the wrong person. Requiring a wrong number recipient to manage a phantom account is not a "reasonable means" standard. It is precisely the kind of friction the FCC and courts forbid.

Relatedly, Defendant's argument addresses revocation under § 64.1200(d), the company-specific internal DNC framework. It does not, and cannot, govern revocation under § 64.1200(c), the National DNC regime. Section (c)(2)(ii) consent terminates immediately upon revocation; there is no reasonable time or reasonable means safe harbor analysis grafted onto NDNC consent. To the extent Defendant's motion conflates the two regimes, the motion misreads the regulations.

Defendant argues that consent does not expire and must be revoked. The cases it cites, including *Van Patten*, *Dolemba*, and *Payton*, all involved valid TCPA consent in the first place. There is no such consent here. The only express signed-writing consent of any kind, if any exists,

would have run to a prior subscriber, and number reassignment extinguished it. Defendant's "10-business-day safe harbor" argument fares no better. As explained above, that provision sits inside the *internal* DNC architecture of § 64.1200(d) and is an *affirmative defense*, not a pleading bar. It *does not apply* to § 64.1200(c) *National* DNC revocations, which terminate *immediately* upon a reasonable revocation. But even if it did apply, it is still an affirmative defense. Pleading an affirmative defense on a motion to dismiss, on a record that does not include any evidence of Defendant's actual processing procedures or any evidence on this affirmative defense, asks this Court to perform summary judgment work without a record. This the Court cannot do. This Court should reject Defendant's arguments in every respect on this issue.

**III. Plaintiff States a Claim Under 47 C.F.R. § 64.1601(e).**

A private right of action under § 227(c)(5) exists for violations of § 64.1601(e). This Court so held in *DaBella*, 2026 WL 496609, at *4-6. Defendant does not appear to challenge that holding here, and for good reason, since the trend nationally is overwhelmingly in plaintiffs' favor since the landmark decision in *Dobronski v. SelectQuote Ins. Servs.*, 773 F. Supp. 3d 373 (E.D. Mich. 2025). Under the precedent he has set in this District, Plaintiff has stated a claim.

So, how then, does Xero claim that its failure to transmit valid CPN or ANI was lawful? By arguing an incorrect technical premise and insisting that 65099 is a "CPN or ANI." It is not. Defendant is wrong as a regulatory matter and wrong as an engineering matter. The regulation defines those terms precisely, and they are precisely what 65099 is not.

Under 47 CFR § 64.1600(e), the FCC defines Calling Party Number (CPN) as the "subscriber line number or the directory number contained in the calling party number parameter of the call setup message associated with an interstate call on a Signaling System 7 network," and it defines an ANI in terms of *delivery* of the CPN or other alternate billing number, as "the

*delivery* of the calling party's billing number by a local exchange carrier to any interconnecting carrier for billing or routing purposes, and to the subsequent delivery of such number to end users." 47 CFR § 64.1600(b). Both definitions are anchored to the *SS7 telephone network*.

A telephone number code like 65099 is not a compliant "CPN" under the applicable regulation, meaning that no CPN, and consequently, no ANI, was transmitted *at all*. And because no CPN or ANI was transmitted, the (fake) number that was transmitted was not a "CPN" or "ANI" that permitted the Plaintiff, or "*any individual*," including an individual with a voice-only telephone, "to make a do-not-call request during regular business hours." A code like "65099" doesn't allow *any* individual, such as an individual possessing a landline phone or a phone that doesn't have the capacity to send out text message calls, to make a Do Not Call request during normal business hours. To see why, one must understand the inner workings of SS7.

Simply put, a short code like "65099" has no meaning in the SS7 routing tables, is unroutable by SS7, and can't be reverse-routed to identify an originating or billing line (i.e. CPN or ANI) to receive an SS7-routable voice call. The SS7 signaling standards dictate that the Calling Party Number (CPN) parameter is carried in the Initial Address Message (IAM) and contains the Telephone Number (TN) of the originating end user. ATIS-1000113.2015-Chapter 2, Clause 2.16, Calling Party Number, and ATIS-1000113.2015-Chapter 3, Clause 3.7, Calling Party Number. That field should be populated with a valid 10-digit North American Numbering Plan (NANP) subscriber line number or directory number; otherwise, it is considered "phantom traffic" since it lacks conforming identifying information. ATIS-0300106, Chapter 8, Clause 2.1, Phantom Traffic (further noting that "[a]lthough 47 C.F.R. §64.1601 requires that the CPN be transmitted where technically feasible, the technical content and format of SS7 signaling is governed by industry standards rather than by Commission rules.").

A short code like 65099 is only 5 digits, which creates several problems. First, it doesn't conform to the NANP structure. NANP numbers are 10 digits (or 1+10 for the country code). The CPN parameter in the IAM expects either a national (10 digit) or international (E.164) compliant number. A five-digit string does not map to any valid CPN parameter. TRAVIS RUSSELL, SIGNALING SYSTEM #7 360-361 (3rd ed 2002) (outlining the structure of the CPN parameter as including two addresses (i.e. CPN and ANI), digits 0 through 9, spares, codes, and an end of pulse signal). So, as a textbook technical matter, "65099" isn't a valid CPN or ANI since it's unmappable to the CPN or ANI fields of the IAM of an SS7 message. Second, short codes like "65099" simply do not exist in the circuit-switched layer of the SS7 network at all. As such, a short code has no meaning in the SS7 routing tables and can't be reverse-routed to identify an originating line to call back. Short codes do not exist in the SS7 circuit-switched layer. They have no SS7 routing table entry, no LIDB record, and no LERG presence. They cannot be routed using SS7, cannot receive voice calls, and cannot have CNAM queried against them. *See generally* TRAVIS RUSSELL, SIGNALING SYSTEM #7 360-361 (3rd ed 2002).

Defendant's contrary position rests on conflating two distinct identifier systems, the SS7 public switched telephone network layer (governed by the regulation) and an SMS messaging center layer (where short codes live). The two are not interchangeable. Calling them so does not make it so. In any event, the Court need not definitively resolve the engineering question at this stage. It is enough that the FAC plausibly alleges that the short code here is not a CPN or ANI = and does not permit any individual to make a DNC request during regular business hours.

The FCC said so itself in the very Order Defendant relies on for other propositions. In its 2005 Order, the FCC reaffirmed that "Calling Party Number" (CPN) refers to the subscriber line number or the directory number contained in the calling party number parameter of the call set-

up message associated with an interstate call *on a Signaling System 7 network.*" *In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 20 F.C.C. Rcd. 3788, 3809 n.148 (2005) (emphasis added).

And, in the 2003 order Defendant also cites, the FCC addressed some telemarketers' concern that their "ability to transmit caller ID information" was "dependent on the deployment of Signaling System 7 (SS7)" but ultimately disagreed because, as a technical matter:

> [W]hile SS7 capability is not universally available, the vast majority of the United States has access to SS7 infrastructure. The SS7 network contains functionality to transmit both the CPN and the charge number. Under the Commission's rules, with certain limited exceptions, common carriers using SS7 and offering or subscribing to any service based on SS7 functionality are required to transmit the CPN associated with an interstate call to connecting carriers. Regardless of whether SS7 is available, a LEC at the originating end of a call must receive and be able to transmit the Automated Number Identification (ANI) to the connecting carrier, as the ANI is the number transmitted through the network that identifies the calling party for billing purposes. Thus, we determine that telemarketers must ensure that either CPN or ANI is made available for all telemarketing calls in order to satisfy their caller ID requirements. Whenever possible, CPN is the preferred number and should be transmitted.

*In Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14120-22 (2003). This isn't mixing apples and oranges. It's mixing apples, oranges, and potatoes. A short code is a different kind of identifier entirely from a CPN/ANI.

Defendant's parade of horribles, that Plaintiff's reading would expose companies across the country to billions of dollars in statutory damages for using a short code, is a misdirection. Plaintiff's position is not that short codes are categorically unlawful. Rather, it is that short codes that do not comply with § 64.1601(e) because they are not valid CPNs or ANIs are unlawful for the specific purpose of *telemarketing*, just like other technologies, like fax messages, used for telemarketing purposes, and covered in other portions of the TCPA. The regulation Plaintiff invokes, 47 C.F.R. § 64.1601(e), applies on its face only to "person[s] or entit[ies] that engage[] in telemarketing." It says nothing about, and expressly includes on its very terms, transactional

Oppn. MTD                                         19

communications, two factor authentication, shipping notifications, appointment reminders, fraud alerts, or any of the other legitimate, non-telemarketing functions for which businesses routinely use short codes. Those uses fall outside § 64.1601(e) entirely and would remain entirely lawful under Plaintiff's reading of the regulation.

What Plaintiff *does* contend is that when a company elects to use a short code for telemarketing, i.e., for promotional messages designed to encourage the purchase or rental of goods or services, it must comply with the caller ID requirement Congress and the FCC built into the TCPA's telemarketing regime. If a company wants to use non-SS7 technologies in its marketing, it must accept the regulatory consequences of operating outside the SS7 framework on which the caller ID regulation depends. The solution is not to read "telemarketing" out of the regulation. Rather, it is for telemarketers to comply with the regulation, or to use a compliant 10-digit SS7 routable telephone number for their text message telemarketing campaigns, as many telemarketers already do. It is the regulation working exactly as written. And the billions of dollars Defendant invokes is, in any event, a measure of how widespread the noncompliance is, not a reason to excuse blatant and rampant noncompliance. *Cf. Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1113 (9th Cir. 2022) (largely upholding nearly billion-dollar TCPA jury verdict).

Defendant cites *Moskowitz*, *Emanuel*, *Epps*, and *Rando* for the proposition that short codes are categorically fine to send telemarketing calls with because those courts dismissed claims involving short codes. But none of those cases asserted, addressed, or analyzed a *§ 64.1601(e) claim*. The plaintiffs there sued on different TCPA provisions. A district court is "under no obligation to take factual claims made by the parties and fashion them into legal arguments," *Smith v. Marsh*, 194 F.3d 1045, 1052 n.5 (9th Cir. 1999), let alone to silently identify unpled legal theories and adjudicate them *sub silentio*. The mere appearance of a short

code in the factual recitation of a case does not constitute a holding that the short code complies with a regulation that was never put at issue in those cases.

The regulation requires that CPN be transmitted so the terminating carrier can deliver a routable telephone number that "any individual" can call "to make a do-not-call request during regular business hours." The Plaintiff has plainly pled a factual allegation, that it is not possible to call that number back, with a voice call, to lodge a Do Not Call Request during regular business hours. As such, the caller ID that was transmitted failed to transmit a *real* "CPN or ANI" as defined by the regulations, and the number that was transmitted does not permit "any individual" to call that number to lodge a Do Not Call request during business hours because it is *unroutable through the telephone network* for the reasons described above. As such, it violated at least two parts of 47 C.F.R. § 64.1601(e). That phrase has a textually obvious meaning Defendant ignores: "any individual," including a person with no SMS-capable device, must be able to make a DNC request. A short code categorically fails that test. It cannot be called with a voice call. An individual with only a landline, or with a mobile phone that lacks SMS capability, cannot reach the sender to opt out at all.

Reading "any individual" to mean "only individuals with text message capable devices" rewrites the regulation. *See Bostock*, 590 U.S. at 653 ("Only the written word is the law"). The "during regular business hours" phrase confirms the Plaintiff's textual reading. The requirement exists because it presumes *someone* must be staffing the line during business hours to process DNC requests. The FCC reasonably set the line at business hours, not 24/7, but the fact it regulated in this manner shows that the FCC was presuming that *someone* would staff the line to handle voice DNC requests. A short code lacking any callback number renders the "regular business hours" requirement meaningless if Defendant's reading prevails, and a regulatory

construction that reads a clause out of the text is disfavored. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 932 (9th Cir. 2008).

Defendant relatedly argues that telling Plaintiff to email support@xeroshoes.com or to reply "STOP" satisfies the requirement. Not so. That is precisely the argument the court rejected in *Newell v. JR Capital, LLC*, where it held that pointing the consumer to a website or to a separate communications channel is not equivalent to permitting a DNC request *through the caller ID itself*. 791 F. Supp. 3d 571, 584-85 (E.D. Pa. 2025). As the *Newell* Court observed, "The administrative record further demonstrates that the FCC considered website urls as a form of compliance with § 64.1601(e)'s identification requirements, but did not implement that option. . . . Despite this specific request, the version of § 64.1601(e) promulgated did not include website urls as a compliance option."). *Id.* The regulation is about what the *caller ID transmits*, not about alternate channels of making a Do Not Call request, which are encompassed by other portions of the TCPA. If embedding an email address satisfied § 64.1601(e), the regulation would be a dead letter and every telemarketer could comply by saying "email us!"

On this point, Defendant claims Plaintiff conceded in the original complaint that 65099 was a CPN or ANI. Read in context, what Plaintiff pled was that "the Caller ID, in the form of both CPN and ANI," appeared as "65099," i.e., that whatever Defendant transmitted *purported* to be a CPN/ANI and appeared as 65099. The FAC clarifies and corrects that allegation to state precisely the technical point developed above. That is what amended pleadings exist for. Pleading inconsistencies between an original and an amended complaint are not legal concessions. At most, they are matters for cross-examination at a later stage. The direct contradiction doctrine applies to reversals in bad faith on dispositive facts, not technical clarifications of facts. *See Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt., Inc.*,

Oppn. MTD                                        22

744 F.3d 595, 600 (9th Cir. 2014). In any event, the disputed factual and legal question of whether 65099 legally *is* a CPN or ANI cannot be resolved on a Rule 12(b)(6) motion.

Finally, Defendant does not meaningfully address and has waived the telemarketer name prong of Section 64.1601(e)(1). In order to query the CNAM (Calling NAMe) database, an SS7 message must transmit sufficient information to query an LIDB database using the CPN. RUSSELL, 72. It's clear: if there's no valid CPN, there's no CNAM to query in an LIDB database. Defendant doesn't even address, and fails to acknowledge, that it did not transmit the "name of the telemarketer" and so it has conceded this point. Section 64.1601(e)(1) requires transmission of "the name of the telemarketer" when available by the carrier. Defendant's motion never addresses the name transmission requirement at all.

The failure to transmit a compliant caller ID *name* itself violates the express terms of § 64.1601(e)(1), *even if* the caller's name appears in the body of the message. *Newell*, 791 F. Supp. 3d at 584; *Novia v. Mobiz, Inc.*, No. 25-CV-11036-AK, 2026 WL 752181, at *3 (D. Mass. Mar. 17, 2026). And, as a technical matter, without a valid CPN or ANI, there is no LIDB entry to query for CNAM, so a structural failure on the CPN prong necessarily defeats the name transmission prong as well. Plaintiff has therefore plainly stated a claim for violation of any one of the three required subparts of 47 C.F.R. § 64.1601(e). Plaintiff's Caller ID claim should proceed in its entirety.

**IV. This Court Has Already Rejected the Theory the Do Not Call Registry Requires Personal Registration.**

As its final basis for moving to dismiss this lawsuit, Defendant argues that the Plaintiff's National Do Not Call Registry claims should be dismissed because the Plaintiff allegedly did not personally register his number on the Registry. However, it concedes in its motion, as it must, that this Court already rejected precisely this motion in *Murch* and that it raises it merely to

"preserve" it. 2025 WL 2466576, at *13-14. And, as Defendant also concedes, other Courts in this Circuit have as well. On its face, the statutory language protects phone numbers until they are removed, regardless of personal registration. The Do Not Call Implementation Act of 2007 directed the FTC that registrations "shall not be removed" except in narrow circumstances, none of which turn on the identity of the registrant. The DNCR is a registry of telephone *numbers*, not names. Treating it otherwise would render the registry unworkable as numbers change hands. The Court should adhere to *Murch* and refuse to dismiss on this basis, as well.

## V. The Motion to Strike Class Allegations Must Be Denied.
### A. This Court Already Denied an Essentially Identical Motion in DaBella; the Same Analysis Applies Here.

Defendant's motion to strike is, in substance, the same maneuver this Court rejected in yet another case involving this Plaintiff in *DaBella*. 2026 WL 496609, at *2. In *DaBella*, the Court rejected similar motion to strike arguments, including on the basis of purported consent, in a case involving the same plaintiff and similar classes as pled here. Judge Simon denied the motion and noted that motions to strike are disfavored, that Ninth Circuit courts routinely deny motions to strike class allegations at the pleading stage, that class certification is the more appropriate vehicle for class definition disputes, and a defendant moving to strike a class before any discovery has been conducted bears the burden of proving the class is *not* certifiable. *Id.* at *6 (citing *Wilson v. Safeway, Inc.*, 2025 WL 2496010, at *5 (D. Or. Aug. 29, 2025); *Mattson v. New Penn Fin., LLC*, 2018 WL 6735088, at *2-3 (D. Or. Nov. 6, 2018); *Ott v. Mortg. Invs. Corp. of Ohio, Inc.*, 65 F. Supp. 3d 1046, 1062-63 (D. Or. 2014); *Bates v. Bankers Life & Cas. Co.*, 993 F. Supp. 2d 1318, 1341 (D. Or. 2014)). Judge Simon further observed that a class may be stricken at the pleading stage only where the "issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named

plaintiff's claim." *DaBella*, 2026 WL 496609, at \*6 (quoting *Gen. Tel. Co. of SW. v. Falcon*, 457 U.S. 147, 160 (1982)).

Relatedly, in another TCPA case involving another set of calls to an evidently wrong telephone number, Judge Kasubhai rejected yet another similar motion to strike argument, reasoning that the plaintiff there plausibly pled the receipt of calls without consent to wrong or reassigned numbers, and that, without the benefit of discovery, plaintiff could be expected to plead little more. *Wilson v. TPH Paralegal Pro. Corp.*, No. 6:25-CV-01703-MTK, 2026 WL 899930, at \*6 (D. Or. Apr. 1, 2026). Defendant cannot satisfy the exceedingly high standard to strike here. It does not identify a facial, incurable defect in any class definition. It raises a panoply of merits defenses, including consent, revocation, the existence of an EBR, and compliance with the TCPA's Caller ID regulations, and asks this Court to assume that these defenses will defeat various Rule 23 elements, chiefly predominance, before any class discovery has occurred. That is not what Rule 12(f) is for.

### B. The National DNC Class Should Not Be Struck.

As an initial matter, Defendant advances no viable, non-speculative argument for why the National DNC class should be struck. It should not. As an initial matter, Defendant's overbreadth argument inverts the law. Defendant argues the National DNC Class is overbroad because its definition does not exclude individuals who consented to Xero Shoes' texts. But that argument has the failsafe doctrine backwards. A failsafe class is one defined so that membership turns on prevailing on the merits. Excluding "consenting" individuals up front from the class definition is *precisely* what creates an impermissible failsafe class. *Sauter v. CVS Pharmacy, Inc.*, No. 2:13-CV-846, 2014 WL 1814076, at \*8-9 (S.D. Ohio May 7, 2014) (a class defined as those who "did not expressly consent" is "the definition of a prohibited fail-safe class"); *Katz v. CHW Grp., Inc.*, No. 5:22-CV-5198, 2023 WL 6445798, at \*7 (W.D. Ark. Sept. 29, 2023) ("every single case that

CHW cites in which TCPA class allegations were stricken on fail-safe grounds did so because the classes included only individuals who did not consent to the receipt of phone calls.") Plaintiff deliberately drafted the class definition to avoid the issues brought about by an impermissible failsafe class that is drafted in terms of consent. Defendant now claims the very absence of failsafe language is itself a defect. The argument is incoherent and impermissible.

Defendant's star case, *Leon v. Loandepot.com, LLC*, gets the doctrine wrong on its own face, and is an outlier that itself demands an impermissible failsafe class. *Leon* demands that a class definition exclude consenting members, the exact construction *Sauter*, *Katz*, and its progeny hold creates an impermissible failsafe class and is *not* properly part of a legally sufficient class definition. *Leon* is unpublished, unbinding, and conflicts with the substantial weight of authority. The Court should not follow it.

Regardless, consent does not pose any unique issues in the TCPA context. Consent is an affirmative defense, and TCPA classes are routinely certified despite asserted consent. Defendant's entire overbreadth theory collapses against the wall of authorities *certifying* TCPA National Do Not Call Registry classes in cases where some claimed consent existed. The reason is that TCPA consent typically rises or falls on the legal sufficiency of common consent documents, or common processes, such as the failure to scrub for reassigned numbers, which are paradigmatically answerable classwide. *See, e.g.*, Mantha v. QuoteWizard.com, LLC, 347 F.R.D. 376, 393 (D. Mass. 2024) (certifying on the basis that the class did not meet legal requirements for consent); *Aley v. Lightfire Partners, LLC*, No. 5:22-CV-00330 (AMN/TWD), 2024 WL 4007345, at *5 (N.D.N.Y. Aug. 30, 2024) ("the sufficiency of the consent procedures used on [a website] under the TCPA is an issue for every Proposed Class Member"); *Williams v. PillPack LLC*, 343 F.R.D. 201, 209 (W.D. Wash. 2022) (holding whether groups of individuals contacted

consented was a common issue making certification appropriate); *Anthony v. Fed. Sav. Bank*, No. 21 C 2509, 2025 WL 3101827, at *8 (N.D. Ill. Nov. 6, 2025) (holding lack of consent was a common question); *Thrower v. Citizens Disability, LLC*, No. CV 20-10285-GAO, 2022 WL 3754737, at *5 (D. Mass. Aug. 30, 2022) (holding that individualized hearings were not necessary to determine if class members submitted their information to a website).

Consent is an affirmative defense for which Defendant bears the burden of proof. *Van Patten*, 847 F.3d at 1044. Rank speculation about whether some class members may have given consent is not a basis for denying certification, let alone for striking class allegations before any discovery. "The possibility that some of the individuals on the list may separately have consented to the transmissions at issue is an insufficient basis for denying certification." *Landsman & Funk PC v. Skinder-Strauss Assocs.*, 640 F.3d 72, 94 (3d Cir. 2011) (abrogated on other grounds) (quoting *Hinman v. M & M Rental Ctr., Inc.*, 545 F. Supp. 2d 802, 807 (N.D. Ill. 2008), and in turn quoting *Kavu, Inc., v. Omnipak Corp.*, 246 F.R.D. 642, 646 (W.D. Wash. 2007)). "[T]he mere mention of a defense is not enough to defeat the predominance requirement of Rule 23(b)(3)." *Bridging Communities Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1126 (6th Cir. 2016).

The classwide consent questions here are uniform. Defendant's argument that consent will require individualized inquiries is wrong on the merits, but in any event premature. The relevant questions for the class are uniform: Was Defendant's opt in language legally sufficient to satisfy 47 C.F.R. § 64.1200(c)(2)(ii)? Did Defendant obtain signed written consent at all? If so, was that consent obtained before a number was reassigned, as reflected in telephone company databases, thus terminating consent? Did Defendant use a common SMS platform, common opt-out logic, common suppression logic, and a common short code? A classwide answer to even

*one of these* questions that is dispositive on a classwide basis renders the putative class certifiable. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 359 (2011) (commonality requires only a common question whose resolution "will resolve an issue that is central to the validity of each one of the claims in one stroke," and "even a single common question will do.").

Defendant misframes the consent issue when it argues that the Court will have to inquire into whether each putative class member "intentionally or accidentally" provided consent. Whether Plaintiff intentionally or accidentally sent the short replies is beside the point. That is not the inquiry, nor is it the legal standard. The inquiry is whether consent was lawfully *obtained* in the first place, a question that turns on the contents of Defendant's records and the legal sufficiency of its consent intake processes and any number reassignment, both of which can be evaluated on a classwide basis. Where the only purported consent is alleged to come from a prior subscriber of a reassigned number, the question is even more uniform. It turns on commercial number assignment records cross-referenced against Defendant's sales database.

Defendant's predominance authorities, including *Pepka*, *Sorsby*, and *Leyse*, were *all* decided after substantial *discovery* into the consent evidence present in those cases. They have no application to a Rule 12(f) motion when no discovery has been conducted yet. Indeed, the Plaintiff's aforementioned authorities show why this is the case directly. Even after discovery, predominance can be satisfied where the relevant consent information lives in defendant's own records, uniform databases subject to expert analysis, or is legally insufficient.

Finally, Defendant's reliance on this Court's decision in *Murch* is distinguishable. The factual posture there was unique and, admittedly, somewhat unsuited for class certification. The defendant there was a business-to-business foreign exchange broker that did not market to consumers, did not run a consumer telemarketing campaign, and had reached the plaintiff only

because her number happened to match a business number listed on a business website. *Murch*, 2025 WL 2466576, at *15. The defendant had called, mistakenly believing it was calling a business to sell its business-oriented services. This matters because business numbers are not entitled to the same protections as residential numbers. In striking the class claims at the pleadings stage, this Court did so not because the Defendant claimed to have consent (it did not), but because the plaintiff there failed to plead any facts showing why any amount of discovery would show that a certifiable class existed of residential numbers who were called for which consent would be required. *Id.* at *16. Looking at the defendant's business practices as pled, the Court concluded that the plaintiff failed to plead the presence of other *residential* consumers who were called and thus were similarly situated, including other members of the general public who were marketed to in such a similar manner. *Id.* at 15.

That narrow holding was confined to its facts, and in any event, leave to amend was granted. The opposite is true here. Xero Shoes is a consumer retail company that runs mass promotional SMS campaigns to thousands or millions of consumers, undoubtedly some of which have been reassigned and/or were wrong numbers, and the FAC identifies specific promotional campaigns and alleges that the classes are identifiable from Defendant's records, telephone records, and number databases. That is pleading precisely the opposite of what the plaintiff in *Murch* did not plead.

### C. The Caller ID Class Should Not Be Struck.

Defendant's arguments for why the Caller ID Class should be struck are even less availing. Defendant argues Plaintiff is not a member of the Caller ID Class because Defendant says it transmitted a compliant CPN or ANI. As shown above, that is wrong as a matter of regulation and technology. So, if the Plaintiff has plausibly pled Defendant failed to transmit a

compliant CPN or ANI, the class should not be struck. Defendant also neglects to grapple with the fact that the class has two prongs: members who received calls/texts that (a) did not transmit a CPN or ANI at all, or (b) transmitted a CPN or ANI that did not permit any individual to make a DNC request during regular business hours. Plaintiff plausibly alleges he falls in both, first, because nothing legally compliant was transmitted (because 65099 is not a CPN/ANI), and second, because the transmitted identifier categorically does not permit voice call DNC requests.

Numerosity is a technical question with a technical answer. Defendant's numerosity argument is remarkable. It asserts Plaintiff has not pled that Defendant transmitted a non-compliant "CPN" or "ANI" to anyone else. The pleading does not need to. If 65099 does not comply with the subject regulation for Plaintiff, it is not compliant for *every* recipient of *every* call Defendant sent through that short code during the class period. Xero Shoes sends mass marketing texts, as evidenced by the text message's contents and its own admissions. Defendant's own records will show the volume. The number of message recipients is the class size, and for a consumer-facing company like Xero that engages in text message marketing, that class will easily satisfy numerosity. *Allison v. Dolich*, No. 3:14-CV-01005-AC, 2019 WL 921436, at *14 (D. Or. Feb. 25, 2019), *aff'd*, 815 F. App'x 135 (9th Cir. 2020) (class of over approximately 40 members will usually satisfy numerosity. Defendant's implicit argument, that no class can be numerous unless other plaintiffs have already filed lawsuits, is not the test.

Next, consent is not a defense to a § 64.1601(e) claim. The caller ID regulation is technical and neutral. Every telemarketing call must transmit a compliant caller ID. There is no "consent" defense to failing to transmit a CPN or ANI. That has an obvious rationale, since any company contacting a consumer believing it had consent would be incentivized to identify itself by its name to promote good will for its brand and reinforce the association. Moreover, the

requirement that the CPN or ANI transmitted permit making a do not call request presupposes that, for some calls, consent had been obtained. It would be nonsensical to draft the regulation in terms of a method to revoke purported consent and then claim that the regulation has purported consent as a defense to the very consent attempting to be revoked as an initial matter. In any event, the regulation governs the act of *initiating* a call with the required identifiers. Because consent is not a defense to that, and because any consent defense would clearly make little sense in the overall context of this regime, the objection Defendant lodges against the Caller ID Class has no legs here. That class is uniform on Defendant's technical conduct.

Defendant's last card against the Caller ID claims is that not every recipient actually wanted or tried to make a DNC request, so each recipient's subjective desire is an individualized question, defeating predominance. But the relevant question is *capability*, not whether the CPN or ANI that was transmitted was actually *used*. Defendant misreads the regulation. Section 64.1601(e) requires the transmission of CPN or ANI and requires the CPN or ANI transmitted to *permit* a DNC request. It imposes a capability requirement, not a use requirement. A door does not cease to have a function just because nobody walks through it. Whether CPN or ANI was transmitted at all, and whether the fake number Defendant transmitted permitted DNC requests, is a single classwide question.

Finally, at least one court has held that the Caller ID regulation addresses concrete consumer harms, being able to opt out of receiving communications and reliably being able to identify from where they are originating, sufficient for Article III standing purposes. *Novia v. Mobiz, Inc.*, No. 25-CV-11036-AK, 2026 WL 752181, at *2 (D. Mass. Mar. 17, 2026). As the *Novia* court explained, caller ID transmission failures constitute a particularized and concrete injury, including because they fail to provide information to which a call recipient is entitled.

"While these injuries are not significant, there is no minimum quantitative limit required to show injury; rather, the focus is on the qualitative nature of the injury, regardless of how small the injury may be." *Id.*  Plaintiff need not allege that he affirmatively attempted to use the DNC mechanism for each text. *Spokeo* based concerns about "bare procedural violations" do not apply to consumer privacy claims under the TCPA, which Congress, and the Ninth Circuit, have identified as concrete harms. *Van Patten*, 847 F.3d at 1043 ("the violation of the TCPA is a concrete, de facto injury"); *Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 988 (9th Cir. 2023) (same). For all these reasons, the Caller ID Class claims should not be struck, either.

### D. The Internal Do Not Call Class Should Not Be Struck.

Defendant makes several additional independent arguments for why the Internal Do Not Call List class should be struck, but most of them have already been adequately addressed and simply regurgitate those for the National Do Not Call class. Defendant's remaining quibbles provide little additional reason to strike. Start with Xero's vagueness argument, which in reality, if anything, is a drafting quibble where the proper remedy for any deficiency is amendment.

Defendant claims the IDNC Class definition is "vague" because it includes individuals who had previously asked for the calls to stop and/or that Defendant was contacting a wrong number. Defendant's real argument is that "wrong number" is not "STOP," which is a merits position on Defendant's chosen language, not a vagueness problem. And the definition of "asked" is relatively self-evident: it means communicated, by any reasonable means, precisely as the FCC has mandated. Whether a particular communication qualifies can be determined from Defendant's own inbound message and contact logs using objective keywords, a practice the FCC has itself endorsed and even listed. To the extent the definition needs refinement, Rule

Oppn. MTD                              32

23(c)(1)(C) permits the Court to refine it at certification. Even if the Court were inclined to refine the phrasing now, the remedy is amendment, not striking.

Next, the consent argument makes no sense for an Internal DNC class. Defendant argues the IDNC Class is overbroad because it would sweep in individuals who previously consented. That is not an overbreadth problem. Again, it is a merits question. And it is *the* merits question, because the entire *point* of that class is that these individuals were contacted after they asked not to. Consent to initial contact is *irrelevant* to an internal DNC claim because consent may be revoked at any time, and the act of asking the messages to stop, by any reasonable means, is the revocation. Defendant's position boils down to the proposition that a class member who consents to one message can never opt out unless he uses the magic word "STOP." That is not the law.

And the facts here make the IDNC Class particularly strong. Defendant believed it was texting "Joseph" throughout. Plaintiff told Defendant "Wrong number." Defendant kept texting. In a wrong number case, "wrong number" is not ambiguous. It tells the telemarketer that the number is associated with the wrong person and that whatever consent the telemarketer thought it had does not belong to the current subscriber. If Defendant's system cannot treat a "wrong number" message as requiring suppression, that is Defendant's TCPA compliance defect.

And, as with the other classes, Defendant insists numerosity is lacking. But the factual reality is that Xero Shoes is a national retailer running calling campaigns on a nationwide scale. The very nature of bulk SMS marketing guarantees that some subset of targets are wrong number recipients, as Plaintiff was, and as any consumer calling campaign of this size produces. The class size cannot meaningfully be assessed without discovery into Defendant's message logs to identify how many recipients communicated stop, wrong number, halt, unsubscribe, remove, or

Oppn. MTD                                          33

similar messages and then received additional promotional calls, and how many calls were made. Defendant has those records. Plaintiff does not need them yet to plead numerosity.

Defendant's sole predominance citation is *Eldridge v. Cabela's Inc.* But *Cabela's* addressed a Section 227(b) revocation class and explicitly rested its reasoning on § 227(b)'s distinct structure, which "does not distinguish between consumers who have requested to stop receiving calls and consumers who never consented in the first place." No. 3:16-CV-536-DJH, 2017 WL 4364205, at *10 (W.D. Ky. Sept. 29, 2017) Section 227(c)(5)'s Internal DNC regime does distinguish between the two. The cause of action runs to any person who received more than one telephone call after making an internal do not call request in violation of § 64.1200(d), and that regulation supplies a discrete framework that asks whether the company's internal do not call procedures were adequate using any of the specified criteria. Defendant's own systems and policies will answer the § 64.1200(d) claims for the entire class.

### E. In Any Event, the Remedy Is Amendment, Not Striking.

Even if the Court were to find any class definition deficient, the proper remedy is amendment, not striking. When impermissible class allegations are stricken at this early stage in the litigation, plaintiffs should be given leave to amend their complaint to proceed. *Harris v. Palm Springs Alpine Ests., Inc.*, 329 F.2d 909, 913 (9th Cir. 1964); *Jimenez v. Menzies Aviation Inc*, No. 15–CV–02392–WHO, 2015 WL 4914727, at *4 (N.D. Cal. Aug. 17, 2015). The Court may refine class definitions at any time, including at the certification stage. *Hunter v. Legacy Health*, No. 3:18-CV-02219-AR, 2024 WL 1155382, at *3 (D. Or. Mar. 18, 2024); Fed. R. Civ. P. 23(c)(1)(C). "At this early stage in litigation, prior to any class discovery or a motion for class certification, the Court cannot determine whether individualized matters will predominate over common issues." *Katz*, 2023 WL 6445798, at *6.

Oppn. MTD                                    34

**Conclusion**

Defendant's motion to dismiss misreads the TCPA's consent regime (which requires an express, signed written agreement containing the subject telephone number), misreads the revocation regime (which the FCC has held cannot be confined to a designated word or channel), and misreads the caller ID regulation (which is anchored to SS7). Its motion to strike asks this Court to do at the pleadings stage what this Court already declined to do in *DaBella* on substantially similar facts. The Court should deny the motion in its entirety. To the extent the Court has any concern about a specific class definition or pleading, the proper remedy is to permit amendment rather than to strike.

RESPECTFULLY SUBMITTED AND DATED this May 19, 2026.

> s/Andrew Roman Perrong
> Andrew Roman Perrong, OSB No. 243320
> a@perronglaw.com
> Perrong Law LLC
> 2657 Mount Carmel Avenue
> Glenside, PA 19038
> 215-225-5529
> Lead Attorney for Plaintiff and the Proposed Class

**CERTIFICATE OF PAGE COUNT**

This brief complies with the applicable page-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains exactly 35 pages, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

Dated: May 19, 2026.

> */s/ Andrew Roman Perrong*
> Andrew Roman Perrong, Esq.

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing via ECF on the below date, which will automatically send a copy to all attorneys of record on the case.

Dated: May 19, 2026                    */s/ Andrew Roman Perrong*
                                        Andrew Roman Perrong, Esq.